**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

CHARLES WILSON,

       Plaintiff,

v.                                       No. CV 16-604 MCA/CG

DENISE R. GONZALES, et al.,

       Defendants.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

**THIS MATTER** is before the Court on Plaintiff Charles Wilson's *Complaint*, (Doc. 1), filed June 17, 2016; Plaintiff's *Amended Complaint*, (Doc. 5), filed July 25, 2016 (collectively "the Complaint"); and Defendants Cathy Catanach, Lia Archuleta, Jerry Roark, and Calvin Robinson's Martinez *Report Submitted by Defendants Cathy Catanach, Lia Archuleta, Jerry Roark, and Calvin Robinson as Ordered in Doc. 17* (the "*Martinez* Report" or "Report"), (Doc. 19), filed November 13, 2017. United States District Judge M. Christina Armijo referred this case to Chief United States Magistrate Judge Carmen E. Garza to perform legal analysis and recommend an ultimate disposition. (Doc. 7). Having reviewed the Complaint, the *Martinez* Report, the record, and the relevant law, the Court **RECOMMENDS** that summary judgment in Defendants' favor be **GRANTED**, and that Plaintiff's Complaint be **DISMISSED WITH PREJUDICE**.

### I.    Background

On April 14, 1971, Plaintiff was sentenced to life in prison and committed to the New Mexico Corrections Department ("NMCD") under the name Charles Wilson. (Doc. 19-5 at 6-7). Plaintiff subsequently converted to Islam and, in 1988, legally changed his name from "Charles Wilson, Jr.," to "Sala-Din Abdul Shaheed Rahman." (Doc. 1 at 22).

Despite this, Plaintiff's claim the NMCD refuses to change Plaintiff's name on his ID badge, legal mail, or other paperwork. *Id.* at 6, 15, 19. Plaintiff claims two other inmates have changed their names on their ID badges and the prison's refusal to change his ID and other paperwork burdens the exercise of his religious beliefs. *Id.* at 8.

Additionally, Plaintiff claims his meals are not being prepared in accordance with his religious tenets. (Doc. 5 at 7-9). Plaintiff states his religion forbids him from eating any processed foods or any food that has been handled or opened by a non-Muslim, and that there is no legitimate reason Defendants should not be ordered to set up a modified halal kitchen within the existing kitchen at Western New Mexico Correctional Facility ("WNMCF"), where Plaintiff was housed when he filed his Complaint. *Id.* at 8-9, 13 (citing *Beerheide v. Suthers*, 286 F.3d 1179 (10th Cir. 2002)). In prison grievance forms, Plaintiff suggested that a Muslim prepare his food or that he receive only pre-packaged meals, including from one specific vendor. (Doc. 19-2 at 19-31).

Plaintiff asserts that the refusal to accommodate his name change or dietary beliefs violates his rights under 42 U.S.C. § 1983, the First Amendment to the United States Constitution, and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc, *et seq.* (Doc. 1 at 1). Accordingly, Plaintiff asks for declaratory and injunctive relief, as well as compensatory and punitive damages against numerous NMCD officials: Denise Gonzales, a hearing officer at WNMCF; Roberta Ortega, Warden of WNMCF; Cathy Catanach, Bureau Chief of Offender Management Services; Lia Archuleta, classification officer at WNMCF; Jerry Roark, Director of Adult Prisons; Summit Boyd, food administrator at WNMCF; and Calvin Robinson, Senior Chaplain of the NMCD. *See* (Docs. 1, 5).

Several of Plaintiff's claims were dismissed without prejudice on initial review under 28 U.S.C. § 1915(e)(2). First, Plaintiff's RLUIPA claims for declaratory and injunctive relief against Defendants Gonzales, Ortega, Archuleta, and Boyd were denied as moot because Plaintiff has been transferred out of WNMCF and those Defendants were no longer in a position to provide any relief. (Doc. 8 at 5). Plaintiff's request for declaratory and injunctive relief under § 1983 against Defendants Archuleta and Boyd were denied as moot for the same reason. *Id.* at 7-8. Next, Plaintiff's § 1983 claims against Defendants Ortega, Gonzales, Roark, and Robinson were dismissed for failure to state a claim. *Id.* at 6-7. Finally, Plaintiff's claims for damages against Defendants Archuleta, Boyd, and Catanach were dismissed because those defendants may not be sued in their individual capacities under § 1983. *Id.* at 8. Later, Defendant Boyd was dismissed from the case entirely. (Doc. 16). Following these dismissals, Plaintiff's surviving claims are: (1) declaratory and injunctive relief under RLUIPA against Defendants Catanach, Roark, and Robinson; (2) compensatory and punitive damages under § 1983 against Defendants Archuleta and Catanach; and (3) declaratory and injunctive relief against Defendant Catanach in her official capacity.[1]

The Court ordered the remaining Defendants to prepare and submit a *Martinez* Report to assess whether any factual or legal bases existed for Plaintiff's remaining claims. (Doc. 17); *see Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978). The Court informed the parties that it may consider the Report in deciding whether to grant summary

---

1. The Court notes that Plaintiff has subsequently been transferred to the Northwest New Mexico Correctional Center. (Doc. 19 at 30). However, Defendants do not request any other defendants be dismissed on mootness grounds.

judgment and urged the parties to submit whatever material they believed would be relevant. *Id.* at 2, 5-6.

On November 13, 2017, Defendants filed the Report, providing substantial factual background. (Doc. 19). First, Defendants explain that NMCD derives its custodial authority based on a Judgment and Sentence Order, and inmates are identified by the name on that Order. *Id.* at 9. Further, NMCD maintains its inmate files almost entirely in paper form; electronic versions exist largely to memorialize what is in the paper file. *Id.* at 10. In Plaintiff's particular case, he was committed under the name Charles Wilson, his inmate file and ID identify him as Charles Wilson, and his inmate file contains nearly fifty years of documentation under that name. *Id.* at 13-14. NMCD recognizes Plaintiff's changed name as an alias in his file, along with several other known aliases, and permits Plaintiff to refer to himself by his changed name, correspond in his changed name, and use his changed name on mail and other forms as long as he uses both his changed and committed names. *Id.* at 27-28.

Next, Defendants clarify that Plaintiff is mistaken about other inmates who had their IDs changed to their religious names. First, regarding an inmate named I-Self Manifest Allah, Defendants state that the inmate changed his name to I-Self Manifest Allah while in NMCD custody, but that neither his ID nor his file were changed. *Id.* at 15-16. Regarding another inmate who allegedly had his ID changed from "Jason Folds" to "Tariq Kalid Rashid," Defendants relate that the inmate was convicted, sentenced, and committed multiple times under multiple names. *Id.* at 16-17. His most recent conviction was under the name Tariq Kalid Rashid, therefore his most recent ID and file reflected that name. *Id.* at 17-18.

4

Regarding Plaintiff's diet, Defendants state that Plaintiff receives an approved religious diet, including one prepackaged meal per day, but the prepackaged meals are significantly more expensive than regular meals. *Id.* at 39-40. Defendants allow Muslim foodservice workers where feasible, but Defendants state it may not be possible to hire Muslim workers at all institutions. *Id.* at 42. Muslim inmates have been assigned to kitchen work when they are qualified, though Defendants have had disciplinary problems with Muslim kitchen staff serving extra food on halal trays. *Id.*

Turning to the merits of Plaintiff's claims, Defendants argue as a preliminary matter that Plaintiff failed to complete the prison grievance procedure as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a). The PLRA requires prisoners to exhaust administrative remedies, and "unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007). Although Plaintiff alleged he exhausted administrative remedies and provided evidence that he did so, Defendants contend that Plaintiff did not exhaust each grievance he filed and his attachments are a mix of exhausted and unexhausted grievances. (Doc. 19 at 18-20, 32-39). Accordingly, Defendants argue the only issues properly before the Court are Plaintiff's claims regarding his name on his ID badge (i.e., not his claims for a name change on legal mail or other paperwork), and that his food should be prepared by Muslims or that he should be served only pre-packaged, certified-halal meals (i.e., not his claim regarding a halal kitchen). *Id.* at 20, 39.

Next, Defendants deny Plaintiff is entitled to relief under either § 1983 or RLUIPA for either his name or dietary claims. Defendants argue they have legitimate, compelling interests in keeping Plaintiff's committed name on his ID badge in order to avoid confusion

and delays in identifying him and other inmates. *Id.* at 23. Defendants say they have reasonably accommodated Plaintiff by including his changed name as an alias in his inmate file, and that Plaintiff may refer to himself and ask other inmates to refer to him by his religious name. *Id.* at 28. Any changes to Plaintiff's ID or file, Defendants assert, would create undue administrative burdens and compromise prison security. *Id.* at 28-29.

Defendants also assert they have legitimate and compelling interests in not further accommodating Plaintiff's religious beliefs regarding his diet. NMCD offers a religious diet that excludes pork and meets other "widely accepted" halal requirements. (Doc. 19-6 at 2). Although Plaintiff may interpret halal requirements more strictly than other Muslim inmates, Defendants argue Plaintiff's alternatives are not feasible. Serving Plaintiff all prepackaged meals would be prohibitively expensive, and Defendants claim maintaining Muslim kitchen staff to serve Plaintiff would compromise prison security and order. Defendants also assert assigning Muslims preferential jobs within the prison can be perceived as unfair and may amount to an impermissible subsidy to a religious group. *Id.* (citing *Abdulhasseb v. Calbone*, 600 F.3d 1301, 1320 (10th Cir. 2010)). Thus, Defendants claim they have legitimate, compelling interests in serving meals within budgetary constraints, maintaining order, and not subsidizing a religious group. *Id.* at 41-43.

At the conclusion of the Report, Defendants requested that Plaintiff's Complaint be dismissed or that summary judgment be entered in their favor. Plaintiff did not respond to the Report, and the time for doing so has passed.

## II. Analysis

### A. Summary Judgment

The Court shall grant summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the case under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is genuine if evidence exists such that a reasonable jury could resolve the issue in favor of the nonmoving party. *Id.* The movant bears the burden of making a prima facie demonstration that there is no genuine issue of material fact. *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670–71 (10th Cir.1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

If the moving party has demonstrated an absence of material fact, the "nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587(1986) (internal quotations omitted). The mere existence of some evidence in support of the nonmoving party, however, is insufficient to deny a motion for summary judgment; rather, there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson*, 477 U.S. at 249. The nonmovant must go beyond the allegations and denials of his pleadings and provide admissible evidence, which the Court views in the light most favorable to him. *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir.1995).

The purpose of a *Martinez* Report is to "develop a record sufficient to ascertain whether there are any factual or legal bases for the prisoner's claims." *Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991). "On summary judgment, a Martinez report is treated like an affidavit, and the court is not authorized to accept its fact findings if the

prisoner has presented conflicting evidence." *Northington v. Jackson*, 973 F.2d 1518, 1521 (10th Cir.1992). A plaintiff's complaint may also be treated as an affidavit if it alleges facts based on the plaintiff's personal knowledge and is sworn under penalty of perjury. *Hall*, 935 F.2d at 1111. A court may not rely on a *Martinez* Report to resolve material disputed facts where it is in conflict with pleadings or affidavits, nor can material factual disputes be resolved based on conflicting affidavits. *Id.* at 1109, 1111. A factual dispute exists even when the plaintiff's factual allegations in conflict with the *Martinez* Report are less specific or well-documented than the factual findings in the *Martinez* Report. *Id.* at 1109.

Finally, the Court must liberally construe a *pro se* litigant's pleadings, including Plaintiff's, and hold them to a less stringent standard than those drafted by an attorney. *See id.* at 1110. However, the Court may not act as a *pro se* litigant's advocate. *Id.* The Court "will not supply additional factual allegations to round out a plaintiff's complaint or construct a legal theory on a plaintiff's behalf." *Whitney v. New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997). In addition, Plaintiff, as a *pro se* litigant, must still follow the same procedural rules governing represented litigants. *Nielson v. Price*, 17 F.3d 1276, 1277 (10th Cir.1994).

## B. Exhaustion Under the PLRA

The PLRA provides that prisoners may not bring a suit challenging prison conditions without first exhausting available administrative remedies. 42 U.S.C. § 1997e(a). This exhaustion requirement applies to all suits brought under federal laws, including § 1983 and RLUIPA. § 1997e(b); *see Chapman v. Lampert*, 555 Fed. Appx. 758, 761-62 (10th Cir. 2014) (unpublished) (applying the PLRA to a suit under RLUIPA and §

1983 regarding kosher diet); *AlAmiin v. Morton*, 528 Fed. Appx. 836, 842-43 (10th Cir. 2013) (unpublished) (requiring exhaustion of RLUIPA claims relating to inadequate halal diet). Further, the exhaustion requirement "applies to all suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

The Supreme Court has held that the PLRA requires "proper" exhaustion of administrative remedies, including timely filing grievances and appeals. *Woodford v. Ngo*, 548 U.S. 81, 91, 93 (2006) ("Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules . . ."). Otherwise, a prisoner's failure to exhaust would "carr[y] no significant sanction." *Id.* at 95. As the Supreme Court explained,

> a prisoner wishing to bypass available administrative remedies could simply file a late grievance without providing any reason for failing to file on time. If the prison then rejects the grievance as untimely, the prisoner could proceed directly to federal court . . . We are confident that the PLRA did not create such a toothless scheme.

*Id.* Accordingly, unexhausted claims must be dismissed with prejudice. *See McMiller v. Jones*, 590 Fed. Appx. 749, 750 (10th Cir. 2014) (unpublished); *Gomez v. Lopez*, 581 Fed. Appx. 724 (10th Cir. 2014) (unpublished).

Finally, "courts are obligated to ensure that any defects in exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007). Further, administrative remedies may be unavailable in certain circumstances, in which case a prisoner would not be required to exhaust "unavailable" remedies. *Ross v. Blake*, 136 S. Ct. 1850, 1859-60 (2016). The Supreme Court of the United States gave three examples of when administrative remedies are

unavailable: (1) when "an administrative procedure . . . operates as a simple dead end–with officers unable or consistently unwilling to provide any relief to aggrieved inmates;" (2) when "an administrative scheme is so opaque that it becomes, practically speaking, incapable of use;" and (3) "when prison administrators thwart inmates from taking advantage of grievance procedures through machination, misrepresentation, or intimidation." *Id.*

The NMCD grievance procedure begins with an informal complaint, after which a complainant may file a formal grievance with a grievance officer. (Doc. 19-1 at 26). The grievance officer must investigate the grievance, prepare a report and recommendation, and provide the report and recommendation to the facility's warden. *Id.* at 29. The warden must review the grievance before approving, disapproving, or modifying the grievance officer's recommendation. *Id.* Finally, an inmate may appeal the warden's decision to the Secretary of the Department of Corrections, the Director of Adult Prisons, or his designee. *Id.* at 30.

In this case, Plaintiff filed four grievances related to his claims: one related to his name claims and three related to his diet claims. In Plaintiff's grievance related to his name, Plaintiff said that two other inmates had their IDs changed to their religious names and asked that his religious name be put "on" his ID and all "legal document[s]." (Doc. 19-2 at 9).Prison officials responded that Plaintiff's ID would remain in the name on his Judgment and Sentence Order and that they will change Plaintiff's ID if his Judgment and Sentence Order is amended. *Id.* at 8. Plaintiff appealed, stating the only resolution was to have his religious name on his ID. *Id.* Plaintiff did not appeal having his name on any other

documents, for instance his legal mail or inmate file. Defendant Roark, then the Director of Adult Prisons, affirmed the lower decisions. *Id.* at 9.

Regarding his diet, Plaintiff first complained that he was not receiving a nutritionally adequate halal diet. *Id.* at 39-40. Plaintiff requested, on behalf of himself and others, prepackaged trays, fresh fruit in one meal, and for an Islamic scholar to observe food preparation and storage in the kitchen once a month. *Id.* This grievance was denied because Plaintiff's religious diet plan was being followed, Plaintiff did not timely file his grievance, and Plaintiff could not file on behalf of multiple inmates or pursue multiple grievances at one time. *Id.* at 34. The warden affirmed the grievance officer's decision, and Plaintiff did not appeal. *Id.* at 35.

Plaintiff then complained again that he was not receiving halal meals. In particular, Plaintiff asserted that the religious diet menu was not being followed and that he had reason to believe his food was being mishandled. *Id.* at 26, 31-32. Accordingly, Plaintiff asked that all his food be prepackaged or that a Muslim prepare his food. *Id.* NMCD officials denied Plaintiff's grievance, stating he was being served a diet as approved by a dietician for Plaintiff and received one prepackaged meal per day. *Id.* at 20. Plaintiff appealed to Defendant Roark, who also denied Plaintiff's grievance. *Id.* at 19.

Finally, Plaintiff filed a grievance stating another inmate was receiving three prepackaged meals and that he was entitled to the same. *Id.* at 59. Plaintiff also alleged that pork was being stored in the kitchen and heated in the microwave, meaning Plaintiff had eaten contaminated, non-halal meals. *Id.* Once again, prison officials denied Plaintiff's grievance, citing compliance with Plaintiff's approved diet. *Id.* at 56. Further,

prison officials stated the other inmate had a different diet due to medical needs that they would not explain due to confidentiality issues. *Id.* Plaintiff did not appeal this decision.

The record shows that Plaintiff completed the NMCD grievance procedure for three claims through two of his grievances: first, that his ID reflect his changed name; second, that he receive three prepackaged halal meals a day; and third, that a Muslim prepare his meals. Plaintiff asked for those specific remedies, and when his grievances were denied, he appealed them to Defendant Roark, the Director of Adult Prisons, completing NMCD's grievance procedure. Thus, Plaintiff fully exhausted the above three claims.

However, Plaintiff did not timely appeal grievances requesting that his name be changed on his inmate file or legal mail or that a modified halal kitchen be constructed. Plaintiff initiated grievances over these issues, and they were addressed by the warden. (Doc. 19-2 at 8, 35, 56). Nonetheless, Plaintiff did not complete the grievance procedure by appealing these issues. The PLRA requires that inmates timely appeal grievances in order to exhaust administrative remedies. *Woodford*, 548 U.S. at 91, 93.These claims are therefore unexhausted and not properly before this Court. In order for Plaintiff to bring his inmate file, legal mail, and halal kitchen claims to federal court, he will have to initiate and timely appeal new grievances. Further, because Plaintiff did not timely follow the NMCD procedure, these claims must be dismissed with prejudice, or the exhaustion requirement would be "toothless." *Id.* Accordingly, the Court recommends Plaintiff's claims regarding his legal mail, inmate file, and a halal kitchen, insofar as they arise from Plaintiff's unexhausted grievances, be dismissed with prejudice.

### C. Plaintiff's Exhausted Claims

Having determined which of Plaintiff's claims are exhausted, the Court will discuss the governing standards applicable to each claim before discussing the merits in turn.

#### 1. *Governing Standards*

##### a. *First Amendment*

Plaintiff first claims that Defendants' refusal to accommodate his name change and dietary requests infringes his First Amendment rights to religious exercise. In *Turner v. Safley*, 482 U.S. 78, 89 (1987), the Supreme Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." The Supreme Court explained that "several factors are relevant in determining the reasonableness of the regulation at issue," including: 1) whether the governmental interest is legitimate, neutral, and rationally connected to the regulation; 2) whether alternative means exist to exercise the infringed right; 3) the impact of accommodating the infringed right will have on guards, other inmates, and prison resources in general; and 4) whether obvious, easy alternatives to the regulation exist. *Id.* at 89-91. The Supreme Court specified that the last factor is not a "least restrictive alternative" test: "prison officials do not have to set up and shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Id.* at 90-91. However, "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* at 91.

##### b. *RLUIPA*

Plaintiff also claims that Defendants' refusal to change his ID or his meals violates RLUIPA. Under RLUIPA, "[n]o government shall impose a substantial burden" on an inmate's religious exercise unless the government demonstrates the imposition of the burden is: (1) "in furtherance of a compelling government interest;" and (2) "the least restrictive means of furthering that compelling governmental interest." §§ 2000cc-1(a)(1)-(2). Religious exercise includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." § 2000cc-5(7)(A). Put differently, RLUIPA's protection "is 'not limited to beliefs which are shared by all of the members of a religious sect.'" *Holt v. Hobbs*, 135 S. Ct. 853, 862-63 (2015) (quoting *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 715-16 (1981)).

The Supreme Court has cautioned that RLUIPA requires more than "broadly formulated" interests. *Id.* at 863 (quotation omitted). Rather, RLUIPA "contemplates a 'more focused' inquiry" and mandates that governments "'demonstrate that the compelling interest test is satisfied through application of the challenged law'" or policy to the individual claimant. *Id.* (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2779 (2015). Courts must "'scrutinize the asserted harm of granting specific exemptions to particular religious claimants'" and "'look to the marginal interest in enforcing' the challenged government action in that particular context." *Id.* (quoting *Hobby Lobby*, 134 S. Ct. at 2779).

### 2. Name Claim

First, Plaintiff claims Defendants' refusal to change his ID to reflect his religious name violates his rights under the First Amendment and RLUIPA. (Doc. 1 at 6-9, 14-18). Defendants concede for the sake of argument that their refusal substantially burdens

Plaintiff's sincere religious beliefs. However, Defendants argue they have legitimate and compelling interests in keeping Plaintiff's ID in his committed name, Charles Wilson, rather than his changed name. (Doc. 19 at 23-28). Defendants claim confusion over Plaintiff's name could cause delays or compromise safety in emergencies, given the discrepancy between his ID and inmate file, and that changing Plaintiff's ID would be administratively burdensome. *Id.* Accordingly, under *Turner*, Defendants contend: (1) they have a legitimate, neutral objective in maintaining consistent files; (2) Plaintiff has alternative means of using his changed name by referring to himself by his changed name and asking others to do the same; (3) changing Plaintiff's ID would have a substantial impact on guards, other inmates, and prison resources in general; and (4) any obvious and easy alternatives have been implemented, such as listing Plaintiff's changed name as an alias. *Id.* at 28-29. As for RLUIPA, Defendants contend their compelling interests in denying Plaintiff's request are: maintaining accurate records with a single, unifying identifier; readily and accurately identifying Plaintiff; and avoiding unnecessary confusion, fragmented records, or other administrative burdens from having to repeatedly change Plaintiff's ID. *Id.* at 29.

It is well settled that an inmate retains a First Amendment interest in using a religiously-motivated changed name, "at least in conjunction with his committed name." *Mailk v. Brown*, 71 F.3d 724, 727 (9th Cir. 1995) (collecting cases). But, an inmate's interest in using his changed name "does not trump the prison's interest in security and efficient record-keeping." *Abdulhaseeb v. Saffle*, 65 Fed. Appx. 667, 672 (10th Cir. 2003) (unpublished). On one hand, prisons can satisfy the First Amendment and RLUIPA by following a "dual-name" or "a/k/a" policy of allowing an inmate to use both his committed

name and his changed name. *See, e.g.*, *Ali v. Wingert*, 569 Fed. Appx. 562, 564-65 (10th Cir. 2014) (unpublished) (holding inmate failed to state a claim under RLUIPA or First Amendment for dual-name policy on legal mail); *Hakim v. Hicks*, 223 F.3d 1244, 1246 (11th Cir. 2000) (holding dual-name policy on ID reasonable under *Turner*); *Fawaad v. Jones*, 81 F.3d 1084, 1087 (11th Cir. 1996) (requiring prisoner to use both committed name and changed name did not violate RLUIPA standard).

On the other hand, multiple courts have held that an inmate may not require a prison to exclusively use the inmate's changed name, whether on IDs or other records. *See Abdulhaseeb*, 65 Fed. Appx. at 672 (denying inmate's claim that having to use his committed name on official forms violated his First Amendment rights); *Fawaad*, 81 F.3d at 1087 (upholding requirement that inmate use both his committed and changed name on legal mail under RLUIPA standard). Courts consistently recognize that prisons have legitimate, compelling interests in security and administration, and that identifying prisoners by their committed name is the least restrictive means of pursuing those interests. *See Fawaad*, 81 F.3d at 1087 (agreeing that maintaining security is a compelling governmental interest and that a dual-name policy is least restrictive means of satisfying that interest); *Ali v. Dixon*, 912 F.2d 86, 91 (4th Cir. 1990) ("There are obvious difficulties present if prison staff must memorize a second name after having made the effort to learn the first."); *Felix v. Rolan*, 833 F.2d 517, 519 (5th Cir. 1987) (holding state had legitimate interest in identification and administration supporting dual-name policy). For instance, in *Abdulhaseeb*, the inmate plaintiff sought to use only his changed name following his legal name change. 65 Fed. Appx. at 671-72. The Tenth Circuit Court of Appeals held that the inmate's First Amendment rights were not violated by the prison

policy requiring the plaintiff to use both his changed and committed names, given the prison's interests in security and efficient record-keeping. *Id.*

In this case, Plaintiff asks that his ID be changed to reflect his religious name. (Doc. 1 at 7). Plaintiff specifies in his request for relief that he wants the Court to ensure that "all IDs are in [his] religious name." *Id.* at 19. Plaintiff's grievances also referred to two inmates who allegedly had their IDs altered to show only their religious changed name. (Doc. 19-2 at 9). In context, Plaintiff is asking for his ID to reflect only his changed name and not his committed name.

As discussed, although Plaintiff has an interest in having the prison recognize his religious changed name, Plaintiff's interest does not overcome Defendants' legitimate and compelling interest in identifying him by his committed name for security and record-keeping reasons. Plaintiff is not entitled, under either the First Amendment or RLUIPA, to have only his changed name on his ID. *See Fawaad*, 81 F.3d at 1087; *Ali*, 912 F.2d at 90-91. Defendants have accommodated Plaintiff by including his changed name as an alias and allowing Plaintiff to go by his changed name, and Plaintiff did not object to Defendants' argument that they have compelling interests in keeping his ID in his committed name. Accordingly, Plaintiff is not entitled to relief under this claim, and the Court therefore recommends dismissing it with prejudice.

The Court remains mindful that it must liberally construe Plaintiff's allegations. *Hall*, 935 F.2d at 1110. However, the Court must refrain from acting as Plaintiff's advocate and supplying legal theories for Plaintiff. *Whitney*, 113 F.3d at 1173-74. Even if the Court liberally construed Plaintiff's request for relief as asking that his changed name be added to his ID under a dual-name policy, rather than asking that his changed name replace his

committed name, it is not clear that Plaintiff has exhausted this claim as required by the PLRA. Exhaustion requires providing enough information "to allow prison officials to take appropriate responsive measures." *Kikumura v. Osagie*, 461 F.3d 1269, 1283 (10th Cir. 2006) (quoting *Porter*, 534 U.S. at 524-25). Plaintiff's grievances request that his changed name be put "on" his ID and he refers to two other inmates who supposedly had their IDs changed from their committed names to their changed names. (Doc. 19-2 at 9). In this circumstance, it is not clear that Defendants were notified that Plaintiff was asking to add his changed name to his ID. And again, Plaintiff did not respond to the *Martinez* Report proposing alternatives to the prison's current policy or otherwise clarifying his request for relief. Accordingly, the Court does not interpret Plaintiff's complaint or grievances as requesting having his changed name on his ID in addition to his committed name.

### 3. *Diet Claims*

Second, Plaintiff claims that his food's packaging and handling violates his religious beliefs. As alternatives, Plaintiff asks that a Muslim prepare his food or that he receive three prepackaged, certified halal meals a day. (Doc. 5 at 7-9). Defendants respond that Plaintiff receives an approved halal diet, including one prepackaged meal per day, and that they do not accommodate Plaintiff further due to budgetary and personnel constraints. For instance, while pursuing his grievances, Plaintiff attached a printout from a supplier of prepackaged halal meals. (Doc. 19-2 at 28). The cheapest Defendants could purchase meals from Plaintiff's suggested supplier is $8 per meal, (Doc. 19 at 34), totaling more than $8,000 a year for three meals a day. Further, while Defendants employ Muslim kitchen staff where feasible, Defendants resist a policy of employing Muslim kitchen staff to accommodate Plaintiff because the staff must be

qualified to work in the kitchen, it may not be possible to staff Muslim workers, and they have had issues with Muslim inmates overserving other Muslim inmates. *Id.* at 42.

Turning to the governing standards, under *Turner*, Defendants contend: (1) their objective in containing costs and reasonably accommodating all diets, including religious diets, is legitimate and neutral; (2) alternative means remain open to Plaintiff in that he may purchase additional halal food through the prison canteen; (3) the impact of serving Plaintiff pre-packaged meals is greater than it might initially appear because others may demand identical or equally expensive meals; and (4) any obvious, easy alternatives have been explored. (Doc. 29 at 41). Under the more exacting RLUIPA standard, Defendants again concede for the sake of argument that Plaintiff's religious exercise is substantially burdened, but they argue they have compelling interests in meeting budgetary constraints and avoiding subsidizing religious groups by providing favorable meals and job assignments. *Id.* at 42. Defendants argue other Muslim prisoners do not necessarily agree with Plaintiff's strict interpretation of his religion's dietary requirements and that other prisoners might request halal diets if they make an exception for Plaintiff. *Id.*

Here again, it is well-settled that inmates have First Amendment interests in diets conforming to their religious beliefs. *See Abdulhaseeb v. Calbone*, 600 F.3d 1301 (10th Cir. 2010) (discussing halal diet under RLUIPA); *Beerheide v. Suthers*, 286 F.3d 1179 (10th Cir. 2002) (discussing kosher diet under the First Amendment/*Turner*). However, whether or not an inmate's meal plan violates the First Amendment or RLUIPA depends on the extent to which the prison accommodates an inmate's beliefs and the inmate's proposed alternative. For instance, in *Ashelman v. Wawrzaszek*, the Ninth Circuit Court of Appeals considered a Jewish inmate's claim that being fed only one kosher meal a day—

a frozen TV dinner–violated his First Amendment rights. 111 F.3d 674, 675 (9th Cir. 1997). The district court in *Ashelman* found that the prison had legitimate penological interests in containing costs and preventing accusations of favoritism, given the high cost of the prepackaged meals. *Id.* at 676. The inmate appealed, arguing he could be accommodated by providing a mixture of non-pork meats, whole fruits and vegetables, and nuts instead of three prepackaged meals. *Id.* at 678. The Ninth Circuit agreed and held that the prison's policy was unreasonable in light of the feasible alternative the plaintiff suggested. *Id.*

By contrast, the Seventh Circuit has denied an inmate's RLUIPA claim for prepackaged meals due to cost concerns. In *Andreola v. Wisconsin*, the plaintiff requested a strict kosher diet, explaining that certain foods could not be stored together and utensils handling the food must be kept separate. 211 Fed. Appx. 495, 496 (7th Cir. 2006) (unpublished). The prison attempted to accommodate the plaintiff by preparing special meals, but plaintiff refused to eat them. *Id.* Eventually, the prison provided the plaintiff with certified kosher meals at nearly four times the cost of non-kosher meals. *Id.* After the plaintiff filed suit under RLUIPA and appealed an adverse decision, the Seventh Circuit held that RLUIPA did not require the prison to spend $2,000 per year providing the plaintiff with prepackaged kosher meals. *Id.* at 499; *see generally Andreola v. Wisconsin*, 171 Fed. Appx. 514, 515 (7th Cir. 2006) (unpublished) (describing the plaintiff's request he receive "Kosher food that is prepared, wrapped and sealed" and opened only by him).

Here, Defendants assert in part that they cannot further accommodate Plaintiff because of what might happen: other inmates might demand expensive halal diets or might believe that the prison is favorably treating Muslim inmates. (Doc. 19 at 41-43).

Defendants also imply that Plaintiff interprets halal requirements more strictly than other inmates; therefore they should be relieved from meeting Plaintiff's extreme interpretation. *Id.* at 41. These arguments are not well-taken, at least under RLUIPA. As discussed, RLUIPA requires more than "broadly formulated" interests and asks whether granting a specific exemption to a particular claimant is the least restrictive means of pursuing a compelling interest. *Holt*, 135 S. Ct. at 862-63 (citation and quotation omitted); *see Yellowbear v. Lampert*, 741 F.3d 48, 57 (10th Cir. 2014) (stating RLUIPA requires "asking whether the government's particular interest in burdening this plaintiff's particular religious exercise is justified in light of the record in this case"). Further, RLUIPA protects religious beliefs which are not necessarily shared by all members of a religion. *Holt*, 135 S. Ct. at 862-63. Accordingly, it is no defense that others might request a diet similar to Plaintiff's or that Plaintiff's religious beliefs are stricter than others'.

However, Defendants have presented uncontroverted evidence that further accommodating Plaintiff is not feasible. Defendants allege that providing Plaintiff with all prepackaged meals is prohibitively expensive, and courts have consistently held that containing costs is a legitimate and compelling interest. *See Andreola*, 211 Fed. Appx. at 499; *Dean v. Corrections Corporation of America*, 108 F. Supp. 3d 702, 716-17 (D. Ariz. 2014) (finding compelling interest and least restrictive means met where prepackaged meals cost over $8,000 annually); *Kahane v. Carlson*, 527 F.2d 492, 496 (2nd Cir. 1975) (declining to require prepackaged kosher meals under First Amendment analysis where there were other feasible alternatives). Unlike in *Ashelman*, Plaintiff has not provided evidence of a less restrictive alternative or more feasible means of accommodating his beliefs. 111 F.3d at 675. Accordingly, the Court finds that denying Plaintiff's request for all

prepackaged meals, while providing an otherwise approved halal diet, is both reasonably related to legitimate penological goals and is the least restrictive means of meeting a compelling interest.

Further, Defendants are willing to allow Muslim food service staff where feasible, but providing that staff for Plaintiff as a policy is impractical for several reasons, including lack of training, unavailability, and a history of preferential treatment. (Doc. 19 at 41-43). RLUIPA was not meant to "elevate accommodation of religious observances over an institution's need to maintain order and safety." *Cutter v. Wilkinson*, 544 U.S. 709, 721 (2005). Under the *Turner* factors, Defendants demonstrated they have a neutral policy of meeting costs and security concerns, they have explored alternatives and are open to accommodating Plaintiff where possible, and Plaintiff may purchase additional halal foods through the prison commissary. Plaintiff has not challenged any of Defendants' evidence, therefore the Court finds that Defendants' denial of further accommodations is reasonably related to legitimate penological goals and is the least restrictive means of furthering a compelling governmental interest. As there is no genuine dispute of material fact as to Plaintiff's diet claims and Defendants are entitled to judgment as a matter of law under RLUIPA and *Turner*, the Court recommends Plaintiff's dietary claims be dismissed with prejudice.

### III.    Conclusion

For the foregoing reasons, the Court finds that Plaintiff has not exhausted administrative remedies for all his claims and that Defendants are entitled to summary judgment on the claims Plaintiff has exhausted. The Court therefore **RECOMMENDS** that Defendants' request for summary judgment be **GRANTED**, and Plaintiff's *Complaint*, (Doc. 1), and

*Amended Complaint*, (Doc. 5), be **DISMISSED WITH PREJUDICE**.

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).   **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.   If no objections are filed, no appellate review will be allowed.**

_____
THE HONORABLE CARMEN E. GARZA
CHIEF UNITED STATES MAGISTRATE JUDGE